260 F.3d 1326 (Fed. Cir. 2001)
 INNOVAD INC., Plaintiff-Appellant,
v.
MICROSOFT CORPORATION, and PSION INCORPORATED, and APPLE COMPUTER, INC., Defendants-Appellees,
and
THE ERICSSON CORPORATION (doing business as Ericsson Technical Services, Inc.),HEWLETT-PACKARD COMPANY, PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION, EVEREX SYSTEMS, INC., SONY ELECTRONICS, INC., LG ELECTRONICS U.S.A. INC., and ODYSSEY COMPUTING INCORPORATED, Defendants.
 00-1459
 United States Court of Appeals for the Federal Circuit
 DECIDED: August 6, 2001
 
 Appealed from: The United States District Court for the Northern District of Texas Judge John McBryde Edward W. Goldstein, Goldstein & Healey, L.L.P., of Houston, TX, argued or plaintiff-appellant. Of counsel were John T. Polasek, Golstein & Healey; and Jonathan T. Suder, Friedman, Young, Suder & Cooke, of Fort Worth, TX.
 James P. Bradley, Sidley & Austin, of Dallas, TX, argued for defendant-appellee Psion Incorporated. With him on the brief was William D. McSpadden.
 Wayne M. Harding, Brobeck, Phleger & Harrison LLP, of Austin, TX, for defendant- appellee Apple Computer, Inc.
 Kristin L. Cleveland, Klarquist Sparkman Campbell Leigh & Whinston, LLP, of Portland, Oregon, argued for defendant-appellee Microsoft Corporation. With her on the brief was John D. Vandenberg. Of counsel was T. Andrew Culbert, Microsoft Corporation, of Redmond, WA.
 Before MAYER, Chief Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.
 RADER, Circuit Judge.
 
 
 1
 On summary judgment, the United States District Court for the Northern District of Texas determined that Microsoft Corp., Psion Incorporated, and Apple Computer, Inc. (among others) did not infringe, either literally or by equivalents, claim 22 of Innovad, Inc.'s U.S. Patent No. 4,882,750 (the '750 patent). Because claim 22 does not cover any dialer units with a keypad and the accused devices include keypads, this court affirms.
 
 I.
 
 2
 The '750 patent claims an automatic telephone dialer system. The claimed system includes: (1) a portable telephone dialer unit, which produces a selected sequence of dialing tones; and (2) a programming means, such as a computer, which preprograms telephone numbers into the memory of the dialer unit. During programming, the dialer unit links to the programming unit. After programming, the dialer unit decouples from the programming unit and functions independently. The portable dialer unit produces tones to automatically dial telephone numbers when held against a telephone mouthpiece. These features made the claimed hand-held dialer units attractive as specialty advertising gift items. Specifically, the units can be preprogrammed with an advertiser's own telephone number and then operate separate from the programming means. Thus, an advertiser can give potential customers a novel way to call its business.
 
 
 3
 Claim 22 of the '750 patent, the only claim at issue in this case, reads:
 
 A telephone dialer system, comprising:
 
 4
 [a] a case having at least one surface for substantially, enclosing a small volume;
 
 
 5
 [b] reprogrammable memory means disposed within said case for storing a selected sequence of digits during a programming mode, said digits constituting at least one telephone number;
 
 
 6
 [c] signal means disposed within said case electrically coupled to said reprogrammable memory means for producing a sequence of dual tone modulated frequency signals corresponding to said at least one telephone number stored in said reprogrammable memory means during a dialing mode;
 
 
 7
 [d] an audio frequency output means electrically coupled to said signal means for producing a sequence of audio frequency signals corresponding to said sequence of dual tone modulated frequency signals produced by said signal means during said dialing mode;
 
 
 8
 [e] at least one battery disposed within said case, electrically coupled and providing power to said reprogrammable memory means, said signal means, and said audio frequency output means;
 
 
 9
 [f] a single, bi-state switch operable from the exterior of said case for activating said signal means to produce said sequence of dual tone modulated frequency signals during said dialing mode corresponding to said digits in said reprogrammable memory means;
 
 
 10
 [g] programming means for programming said reprogrammable memory means with said at least one telephone number during said programming mode; and
 
 
 11
 [h] means for releasably electrically coupling said reprogrammable memory means and said programming means only during said programming mode.
 
 
 12
 '750 patent, col. 14, l. 44-col. 16, l. 5 (emphasis added). For the purposes of discussion and claim construction, the different clauses of claim 22 are designated elements [a]-[h].
 
 
 13
 On November 30, 1999, Innovad sued Psion, Apple Computers, Ericsson Corp., Hewlett-Packard Co., Phillips Electronics North America Corp., Everex Systems, Inc., Sony Electronics, Inc., and LG Electronics U.S.A., Inc., alleging patent infringement of claim 22 for making, selling, and using palm-sized computers that automatically dial preprogrammed telephone numbers when loaded with appropriate software. In the same action, Innovad also sued Microsoft and Odyssey Computing Inc., alleging patent infringement for manufacturing the software to perform these functions.
 
 
 14
 Before discovery, Microsoft, Psion, and Apple moved for summary judgment of non-infringement. In its Memorandum Opinion and Order, the district court construed the invention as smaller than prior art dialers units with a 4.4 cubic inch volume. Innovad, Inc. v. Microsoft Corp., 99 F.Supp.2d 767, 773 (N.D. Texas June 6, 2000) (Innovad). The district court also determined that the claimed dialer system has only a "single, bi-state switch" on the outside of the case to activate the signal. Id. at 773. In addition, the district court construed "means for releasably electrically coupling said reprogrammable memory means and said programming means only during said programming mode" to mean that the dialer is linked to the programming means only temporarily during programming. Id.
 
 
 15
 Based on that claim construction, the district court concluded that the claimed system could not include a keypad. Moreover, because the dialer unit has no keypad, the district court determined that an individual who uses the system as a dialer could not change the preprogrammed telephone numbers within the unit's memory. Next, the district court determined that the accused dialer units each contained an integral numeric keypad to delete, edit, and replace phone numbers. Id. at 773-74. Thus, the district court granted summary judgment of no infringement either literally or under the doctrine of equivalents.
 
 
 16
 Innovad appeals under 28 U.S.C. § 1295(a)(1) (1994). On appeal, Innovad argues that the district court erred in construing claim 22 to preclude a keypad. In addition, Innovad contends that the district court misconstrued three terms or phrases in the claim: "small volume" in element [a]; "single, bi-state switch" in element [f]; and "means for releasably electrically coupling said reprogrammable memory means and said programming means only during said programming mode" in element [h].
 
 II.
 
 17
 Claim construction is a matter of law, which this court reviews without deference. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed. Cir. 1998) (en banc). This court also reviews grants of summary judgment without deference. Johns Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1353, 47 USPQ2d 1705, 1713 (Fed. Cir. 1998). This court must decide for itself "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In making this determination, this court views the record in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc., 911 F.2d 670, 672-73, 15 USPQ2d 1540, 1542-43 (Fed. Cir. 1990).
 
 A.
 
 18
 As an initial matter, this court notes that claim 22 does not expressly recite a "dialer unit" or "portable telephone dialer," as in claims 1-14. Instead, claim 22 recites a "telephone dialer system" without actually using the term "telephone dialer" alone, as in earlier claims. The specification, however, describes the words "dialer" or "dialer unit" (used interchangeably) in terms that identify elements [a]-[f] of claim 22 as the elements of a dialer unit. See, e.g., '750 patent, abstract; col. 2, ll. 9-18; claims 1, 5 and 8. In other words, the "telephone dialer system" of claim 22 comprises: (1) a dialer unit, elements [a]-[f], specifically a case, reprogramming memory means, signal means, an audio frequency output means, at least one battery, and a single, bi- state switch; (2) a programming means, element [g]; and (3) a means for releasably electrically coupling the reprogrammable memory means (i.e., the dialer unit) to the programming means, element [h].
 
 
 19
 The district court may have confused the terms "telephone dialer system" and "dialer unit." For example, the district court states: "[T]he telephone dialer system does not include a keypad as did existing repertory dialers. Moreover, the dialer unit itself had no mechanism through which the end user could reprogram the telephone number". Innovad, at 773 (emphasis added). The entire claimed system, however, can include a keypad. To be precise, the "programming means" of the claimed telephone dialer system can include a keypad, as seen from the specification and claim 15 (similar to claim 22, except that only a single telephone number is programmed into the reprogramming memory means) and dependent claim 21. See also '750 patent, col. 1, ll. 65-67; col. 5, ll. 33-37. In fact, a keypad on the programming means allows the user to enter telephone numbers into the programming means during the programming mode. Col. 5, ll. 33-40, Figs. 1 and 2. Moreover, figures 1 and 2 of the patent show a detachable keypad on the detachable programming mode.
 
 
 20
 The dialer unit component of the claimed system, which can be separated and operated independently from the programming means (col. 5, ll. 62-63, Fig. 1), however, is a different matter. The dialer unit does not include a keypad. No doubt the district court referred to this component of the system when it referred to the absence of a keypad.
 
 
 21
 The specification of the '750 patent states:
 
 
 22
 The present invention has several distinct advantages over existing repertory dialers. First, since the dialer unit has no keypad, it is less expensive than repertory dialers and thus more suitable for specialty advertising use. Second, since the dialer unit has no keypad it is much smaller than existing repertory dialers and thus more portable and suitable for specialty advertising purposes. Third, since the repertory dialer has no keypad it may not be reprogrammed by the end user. However, the dialer unit is not permanently programmed with a selected number and may be reprogrammed when desired by recoupling the dialer unit to the programming unit; this feature is particularly useful when a company number is changed, or when the dialer unit has been programmed with an incorrect number. Considerable savings can be realized due to the reprogrammable nature of the dialer unit of the present invention since the dialer units are reusable, and since programming errors may be corrected. Fourth, since the dialer has no keypad, a substantial portion of the surface area of the dialer case is available for custom printing.
 
 
 23
 Col. 2, ll. 24-46 (emphasis added). In other words, the dialer unit - elements [a]-[f] of claim 22 - contains no keypad, although the programming means - element [g] - may include a keypad.
 
 
 24
 In construing the language of a claim, this court consults the specification and relevant prosecution history to provide context for understanding the meaning of the terms to one of skill in the art at the time of invention. Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309, 51 USPQ2d 1161, 1169 (Fed. Cir. 1999). This interpretative process forbids importing limitations from the specification into the defining language of the claims. Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1053, 12 USPQ2d 1474, 1476 (Fed. Cir. 1989). After determining the scope of the claims with reference to the context in the specification and the prosecution history, this court may determine that significant subject matter does not fall within the bounds of the exclusive right. Watts v. XL Sys., Inc., 232 F.3d 877, 882, 56 USPQ2d 1836, 1839 (Fed. Cir. 2000). Thus, the specification and prosecution history enlighten the bounds set by the claims and the limits of the patentee's right to exclude. Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., 242 F.3d 1337, 1341, 58 USPQ2d 1059, 1062-63 (Fed. Cir. 2001); Watts, 232 F.3d at 882; O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1581, 42 USPQ2d 1777, 1781 (Fed. Cir. 1997); Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1382-83, 53 USPQ2d 1161, 1164-65 (Fed. Cir. 1999); Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1551, 37 USPQ2d 1609, 1612 (Fed. Cir. 1996); Southwall Techs. Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576, 34 USPQ2d 1673, 1676 (Fed. Cir. 1995).
 
 
 25
 As recounted above, the '750 specification shows that the term "dialer" within the claimed telephone dialer system, elements [a]-[f] of claim 22, does not include a keypad. Repeatedly, the specification emphasizes that "the dialer has no keypad." Moreover, the patent disclosure stresses the "specialty advertising use" of the invention. '750 patent, col. 1, ll. 9-52. In a lengthy discourse on the invention, the specification explains that the size, expense, and reprogramming capability of a keypad "destroy[s] the advertising value of the dialer." Id. at ll. 47-52. Evidently, the purpose of the invention is to provide a small, cheap item that contains only the advertiser's business number. A keypad, according to the specification, renders the prior art dialers "useless as specialty advertising give-away items." Id. at ll. 39-41. Thus, the specification clarifies both the meaning of elements [a]-[f] and the reasons for excluding a keypad from those elements. The claimed invention therefore comprises a dialer unit (which comprises elements [a]-[f], but not a keypad), a programming means (which may include a keypad), and a means for releasably electrically coupling the dialer unit and the programming means during programming mode.
 
 B.
 
 26
 The district court construed the term "small volume" to mean a device smaller than the prior art portable telephone dialers. These prior art dialers have a 4.4 cubic inch volume. Innovad, at 773. The specification of the '750 patent does not expressly define "small volume," but does refer to the word "small" in the general sense, i.e., not large. See, e.g., col. 3, l. 8 ("small rectangular case"); col. 2. ll. 20-21 ("two small rectangular sound ports"); col. 5, ll. 41-42 ("small quantities of portable dialer units"). The specification reiterates that the dialer's size affects its function: "[T]he dialer unit has no keypad, it is much smaller than existing repertory dialers and thus more portable and suitable for specialty advertising purposes." Col. 2., ll. 28-31. In other words, the specification provides no specialized meaning for the term "small volume," but relates the term to the dialer's function. Specifically, "small volume" means that the dialer should be comfortably portable. Neither the words of the claim nor its context, however, limit the claimed dialer within the system to a particular volume. Thus, the term "small volume" does not limit the dialer to a particular size as long as it performs its function. The claim term "small volume" does reemphasize, however, that the portable dialer unit does not include a keypad. The specification itself notes that a keypad would inhibit the portability of the hand-held item. Id.
 
 C.
 
 27
 The district court determined that the dialer unit of the claimed invention has only a "single, bi-state switch" operable from the exterior of the case for activating the signal. In other words, the district court observed that the term "single, bi-state switch" bolsters its claim construction excluding a keypad from the dialer unit. A keypad, after all, has a number of switches.
 
 
 28
 The "single, bi-state switch" refers to a switch on the dialer unit that can activate "said signal means to produce said sequence of dual tone modulated frequency [DTMF] signals during said dialing mode corresponding to said digits in said reprogramming memory means." See element [f] of claim 22. In other words, a single switch on the dialer unit activates the tones to dial a telephone number. Col. 4, ll. 53-58 ("In the preferred embodiment, switch means 207 is a single bi-state . . . switch that is operable from the exterior of the case. Switch means 207 . . . serves to activate the last number redial feature of the signal means."); col. 6. ll. 1-6 ("The operator then depresses switch means 207. . . . This activates the last number redial feature of the signal means 201 to produce a sequence of [DTMF] signals corresponding to the digits stored in the reprogrammable memory means 203."). This language about "a single, bi-state switch," however, does not preclude a dialer unit from having other switches as long as a single switch activates the signal means to produce dial tones. The claim language explains well the function of the single switch. This language alone does not preclude other switches for other functions that may not be specified in this claim. Indeed, by using the transition term "comprising" at the outset of the claim, the claim drafter signaled that an accused device could have additional elements - such as switches - beyond those expressly recited and still literally fall within the claim terms. AFG Indus. v. Cardinal IG Co., 239 F.3d 1239, 1244-45, 57 USPQ2d 1776, 1780 (Fed. Cir. 2001).
 
 
 29
 For the reasons stated above, the dialer unit does not have a keypad. The term "single, bi-state switch," as well as the specification describing that term, do not limit the dialer unit to only one bi-state switch. The claim language does not preclude other switches on the exterior of a dialer unit, such as another switch to choose a different preprogrammed telephone number. The term "single," however, precludes the use of multiple switches to perform the activating function for one phone number. Only a single switch activates the dialing function for a preprogrammed number.
 
 D.
 
 30
 The district court also construed "means for releasably electrically coupling said reprogrammable memory means and said programming means only during said programming mode" to require only temporary coupling between the programming means and the dialer unit. Because the dialer unit does not contain a keypad, it must be coupled to the programming means for programming. The claim construction of element [h] by the district court is therefore correct. The dialer unit is only programmed, i.e., the programming mode only takes place, during the temporary coupling of the programming means to the dialer unit.
 
 III.
 
 31
 In response to Innovad's appeal, Microsoft and Apple note that Innovad appealed to this court the final judgments of the district court as to Microsoft, Psion, and Apple, but not as to Sony, another party in the original lawsuit. Microsoft and Apple argue that because Innovad chose not to appeal a final judgment with regard to Sony, Innovad cannot challenge the claim construction underlying that judgment, i.e., the claim construction decided by the district court in its Memorandum Opinion and Order dated June 6, 2000.
 
 
 32
 Under the doctrine of issue preclusion, also called collateral estoppel, a judgment on the merits in a first suit precludes relitigation in a second suit of issues actually litigated and determined in the first suit. In re Freeman, 30 F.3d 1459, 1465, 31 USPQ2d 1444, 1448 (Fed. Cir. 1994) (citing Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 326 (1955)). Issue preclusion operates only if: (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. Freeman, 30 F.3d at 1465; A.B. Dick Co. v. Burroughs Corp., 713 F.2d 700, 702, 218 USPQ 965, 967 (Fed. Cir. 1983).
 
 
 33
 Issue preclusion does not require identical parties; preclusion may be invoked in a case involving the same plaintiff and either a party or a non-party to the first action. Freeman, 30 F.3d at 1467; Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313 (1971). The Supreme Court has urged relitigation of issues, when the prior litigation raises questions about the quality, extensiveness, or fairness of its procedures. Freeman, 30 F.3d at 1467; Montana v. United States, 440 U.S. 147, 164 n.11 (1979).
 
 
 34
 In this case, however, this court detects no "first" or "second" action for the purpose of issue preclusion. No action before this court qualifies as fully resolved "prior litigation." Rather, Microsoft and Apple simply attempt to characterize other components of the decision below as prior litigation. A "full and fair opportunity to litigate" a particular issue includes a party's ability to appeal. Moreover, a "resolution" and "final judgment" envision a complete adjudicative process. As is evident in this appeal, the process is not final nor are the claim construction issues resolved when this court has construed the claims in some ways differently from the commendable work done by the trial court. By its terms, the doctrine of issue preclusion is not available at this stage of this adjudicative process. Moreover, for excellent policy reasons, the doctrine of issue preclusion does not require Innovad to include all parties involved below in its appeal, which would preclude the opportunity of settlement with any party before appeal. Innovad can preserve its full rights to appeal without including all parties to the district court's judgment.
 
 IV.
 
 35
 Whether an accused device infringes a properly construed claim is a question of fact. Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1360, 54 USPQ2d 1308, 1312 (Fed. Cir. 2000). Summary judgment, therefore, should ordinarily be vacated or reversed if based on a claim construction that this court determines includes error. Burke, Inc. v. Bruno Indep. Living Aids, Inc., 183 F.3d 1334, 1338, 51 USPQ2d 1295, 1298 (Fed. Cir. 1999); Int'l Visual Corp. v. Crown Metal Mfg. Co., 991 F.2d 768, 772, 26 USPQ2d 1588, 1591 (Fed. Cir. 1993). However, if the record discloses no genuine issues of material fact and the movant remains entitled to judgment as a matter of law despite an error in claim construction, this court can affirm the district court's grant of summary judgment. Fed. R. Civ. R. 56(c); Celotex, 477 U.S. at 322 ; Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 212 F.3d 1377, 1381, 54 USPQ2d 1841, 1843 (Fed. Cir. 2000).
 
 
 36
 Because the district court correctly determined the meaning of the claims on the point that distinguishes the accused systems from the claimed system, this court concludes that the district court correctly decided that the accused devices do not infringe the '750 patent either literally or under the doctrine of equivalents. As pointed out by the district court, "[Innovad] does not dispute that each of the accused hand-held computers has an integral keyboard with numeric keypad that may be used to delete, edit, or replace any stored phone number." Innovad, at 773.
 
 
 37
 The accused devices can be preprogrammed two ways: (1) by directly programming the "dialer unit" (i.e., the hand-held computer) via a keypad on the unit itself; or (2) by programming the dialer unit via a personal computer and "a means for releasably electrically coupling said reprogrammable memory means and said programming means." Innovad argues that because the accused devices can do (2), which is presumably encompassed by claim 22, the accused devices infringe claim 22. The dialer unit of the accused devices, however, also includes a keypad, which allows direct programming. In other words, the dialer unit of the accused devices can be programmed even when a programming means is not releasably coupled to the dialer unit.
 
 
 38
 As discussed above, the dialer unit (i.e., elements [a]-[f]) of claim 22 cannot include a keypad. Moreover, because it does not have a keypad, the dialer unit of claim 22 can only be programmed during the temporary coupling of the programming means to the dialer unit. As discussed in the '750 specification and during prosecution, these are the very features that distinguish the patented invention from the prior art. Thus, the record contains no genuine issues of fact regarding infringement of claim 22. Because the dialer unit of the accused devices contains a keypad, allowing the dialer to be programmed even when the programming means is not releasably coupled to the dialer unit, the accused devices do not infringe claim 22, either literally or under the doctrine of equivalents.
 
 CONCLUSION
 
 39
 The district court misconstrued the terms "small volume" in element [a] and "a single, bi-state switch" in element [e] of claim 22, and erred in suggesting that the entire claimed "telephone dialer system" does not include a keypad. The district court correctly determined, however, that the dialer unit of the claimed invention (i.e., elements [a]-[f]) does not include a keypad. The district court also correctly construed element [h] of claim 22 when it determined that the dialer unit of the invention, when not electrically coupled to the programming means, has no mechanism through which an end user can reprogram a telephone number.
 
 
 40
 Likewise, the lower court correctly concluded that there is no genuine issue as to any material fact regarding literal infringement or infringement under the doctrine of equivalents by the accused devices. Unlike the claimed invention, the dialer unit of the accused devices includes a keypad, which allows for direct programming without electrical coupling to a separate programming means. This court therefore affirms the district court's summary judgment of no infringement.
 
 COSTS
 
 41
 Each party shall bear its own costs.
 
 AFFIRMED