BRYSON, Circuit Judge,
dissenting.
In my judgment the appellants have presented sufficient evidence to establish the existence of a genuine issue of material fact on the relevant market issue. However counterintuitive it may be to those who are not habitués of gambling establishments, the appellants’ evidence raises a triable question of fact as to whether there is a separate market for slot machines that include a secondary bonus game with a spinning wheel, machines that are referred to as “wheel games” in the gaming industry.
Bally has shown that IGT was charging supracompetitive prices before Bally entered the wheel game market and that Bally’s entrance into the market pressured IGT to lower its prices to a competitive level. Ron Rivera, IGT’s Senior Vice President of Sales, testified that IGT successfully rebuffed calls for discounts on its wheel games before Bally began manufacturing wheel games, but that it was forced to acquiesce in those demands when customers were able to buy Bally’s wheel games. IGT admits that the discounts were the direct and sole result of Bally introducing its wheel games into the market. The fact that IGT’s wheel games were subject to price pressure only when other wheel games entered the market indicates that consumers were willing to incur monopolistic pricing without shifting demand to non-wheel games, i.e., that there was very little, if any, cross-elasticity of demand between wheel games and non-wheel games.
IGT’s own expert, Richard Troxel, admitted that he saw no need to calculate cross-elasticity of demand because there was such strong demand for wheel games independent of demand for non-wheel games: “[T]he wheel has such a demand and drawing power for consumers that ... it seemed to me that the price elasticity was not the issue. Price elasticity occurs when you have products that are of a nature that price is going to make a difference to the consumer, and whether or not *1349 they would move to a different type of product or not. In this case the wheel was what they wanted.” That evidence indicates that there was demand for wheel games separate from casino gaming machines generally and that consumers would rather bear a small but significant non-transitory increase in price than switch to non-wheel games.
That analysis is consistent with the evidence from Bally’s expert, Gregory Adams. While referring to IGT’s economic data, he stated that the margin and profit per unit for wheel games is higher than for non-wheel games and that “the demand for wheel games appears to differ from the demand for non-wheel games, even when controlling for [all other variables].” Those statements and the economic data underlying them provide further support for Bally’s contention that wheel games form a separate product market.
IGT asserts that Bally was required to calculate cross-elasticity of demand and that Bally’s failure to do so is fatal to its claim. The case law, however, does not mandate such a showing by an antitrust plaintiff. See, e.g., Knutson v. Daily Review, Inc., 548 F.2d 795, 804 (9th Cir.1976) (plaintiffs did not have to “produce a numerical value of the cross-elasticity of demand” to prove a relevant market; “[p]roofs of the [Brown Shoe ] factors ... would have sufficed”); FTC v. PPG Indus., Inc., 798 F.2d 1500, 1504-06 (D.C.Cir. 1986) (using as relevant factors consumer and manufacturer perceptions and conduct); In re Live Concert Antitrust Litig., 863 F.Supp.2d 966, 984-86 (C.D.Cal.2012) (collecting cases standing for the proposition that “while calculating the cross-elasticity of demand (and supply) is the preferred methodology, it is not an absolute requirement”); see also Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1376-78 (Fed. Cir.2003) (crediting expert who purportedly “failed to calculate the cross-elasticities of demand” and finding that the “failure to present all of the economic evidence that Harris now identifies does not mean that Ericsson failed to present sound economic evidence”). Bally’s evidence indicates a clear absence of cross-elasticity of demand between wheel and non-wheel games that obviates the need to quantify the degree of the elasticity.
The majority contends that Bally’s relevant market argument fails because it has not offered evidence as to the baseline prices for wheel games from which IGT obtained a premium based on its allegedly monopolistic practices. But Bally offered evidence that, when it introduced wheel games into the market, IGT was required to reduce its prices, and that evidence included the amount by which those prices were reduced, when competitive wheel games became available. That is precisely the kind of evidence that shows the effect of the allegedly monopolistic conduct on the market. See 2B Philip E. Areeda et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application §§ 533b, 563a (3d ed. 2007) (“Areeda”).
IGT’s evidence of lost profits due to patent infringement provides a further indication that the relevant market is limited to wheel games. See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir.1978). In making its case for damages in the form of lost profits, IGT asserted that there were no acceptable noninfringing substitutes for its wheel games. Mr. Troxel testified that there were no non-wheel game substitutes and that Bally’s wheel games replaced IGT’s wheel games on a one-for-one basis. Because “Panduit’s second factor, properly applied, ensures that any proffered alternative competes in the same market for the same customers as the infringer’s product[,]” BIC Leisure Prods., Inc. v. Windsurfing Int’l, Inc., 1 F.3d 1214, 1219 *1350 (Fed.Cir.1993), the lack of any acceptable non-infringing alternatives strongly suggests that the market consisted of only IGT’s and Bally’s wheel games. In other words, IGT’s evidence that there were no alternatives to which consumers could shift their demand other than Bally’s products is evidence that the relevant market was limited to wheel games.
IGT’s higher prices and profit margins on wheel games cannot be attributed simply to normal economic performance in a differentiated product market that includes wheel and non-wheel games. The court in United States v. Oracle Corp., 331 F.Supp.2d 1098, 1116 (N.D.Cal.2004), addressed that issue persuasively, explaining why monopolistic rents do not survive in a differentiated market lacking barriers to entry:
Like a seller in a perfect competitive market, however, sellers in a “competitive” differentiated products market do not obtain monopoly rents. In differentiated product markets with few barriers to entry, firms will introduce products that are increasingly close, although not perfect substitutes, for the other products in the market. The introduction of additional products causes the demand curve faced by each seller to shift downward and leftward until, at long run equilibrium, the demand curve intersects the average cost curve of the seller (defined as economists define costs to include a reasonable profit) eliminating the monopolistic rent....
Although close substitutes, such as reel bonus games and tower bonus games, had been introduced, casinos still sought out wheel games despite the higher prices for those products, indicating the existence of a separate market for wheel games. If a product is priced higher than similar competing products, rational cost-minimizing consumers will shift to the lower-priced similar products, even if the lower-priced products differ somewhat from the preferred product. If, instead, there are no similar or acceptable alternatives (as occurs in a monopolized market or where patent protection bars the introduction of competitive alternatives), consumers will bear the increased price for the preferred product because there are no satisfactory alternatives to which demand can be shifted.
Because IGT’s patents barred potential competitors from marketing wheel games, the majority’s reference to supply elasticity is beside the point.[1] The majority argues that the fact that there are no unique production facilities or specialized vendors for wheel games indicates that there is production cross-elasticity and thus elasticity of supply. But the existence of IGT’s patents barred competitors from producing wheel games regardless of how easy it would have been to do so. The whole point of IGT’s obtaining patent protection for wheel games was to limit the economic effects of supply elasticity.
Bally’s evidence was sufficient to create a genuine issue of material fact as to whether IGT used its patents to maintain a monopoly in a market that was sufficiently separate from the market for other slot machines that IGT was able to demand monopolistic prices over an extended peri *1351 od of time. It is not enough to say that IGT’s wheel games competed with other bonus games or other slot machines in general. It could equally be said that IGT’s machines competed with other casino games or even with entertainment activities generally. But that does not overcome Bally’s showing that there was a discrete market for wheel games within the overall slot machine, gaming, and entertainment markets, as demonstrated by the persistent monopolistic prices that resulted from the patent-based curtailment of supply and the customer-preference driven specificity of demand. See Areeda § 533c, at255.[2]
In light of the record evidence summarized above, I conclude that Bally has presented sufficient evidence for a reasonable finder of fact to find that the relevant product market is limited to wheel games. The relevant market inquiry seeks to determine the scope of the market in which a monopolist can exert market power over buyers. Bally alleges, and has introduced evidence to prove, that IGT had market power over buyers in supplying wheel games. I therefore respectfully dissent.

. Supply elasticity is a theory that neither . party advanced. In fact, IGT argued that "the critical question in determining an antitrust product market is the ' "cross-elasticity” of demand' between products.... Stated differently, the relevant antitrust market is the smallest group of products for which a hypothetical monopolist could profitably impose a 'small but significant and non-transitory increase in price’ (SSNIP).” The majority not only assigns weight to the allegedly high supply elasticity for wheel games but, in discussing demand elasticity, disparages the same test that IGT believed to be "the critical question” in resolving this issue.

. Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir.1995), on which the majority relies, stands for the unremarkable proposition that a high degree of supply elasticity can bear on the relevant market inquiry and may even be determinative in some cases. In that case the court found that full-serve gas stations were potential competitors of self-serve stations — -and thus belonged in the relevant market — because full-serve stations could "easily convert their full-serve pumps, at virtually no cost, into self-serve, cash-only pumps, expanding output and thus constraining any attempt by [the alleged monopolist] to charge supracompetitive prices for self-serve gasoline.” Id. at 1436. Critically, however, nothing prevented the full-serve stations from making that change to their business in order to deter or rein in potentially monopolistic pricing by self-serve stations. Here, by contrast, potential suppliers were discouraged from entering the wheel game market by vigorous enforcement of the very patents that are being attacked as unlawful.