Menno TOEWS and Evelyn
Toews, Plaintiffs,

v.

The UNITED STATES, Defendant.

Norman Meachum, Plaintiff,

v.

The United States, Defendant.

Nos. 00–508L, 01–107L.

United States Court of Federal Claims.

July 31, 2002.

Robert J. Rosati, Fresno, California, for the plaintiffs, Menno Toews and Evelyn Toews, and Norman Meachum.

William J. Shapiro, Trial Attorney, United States Department of Justice, Environment and Natural Resources Division, for the United States. With him on briefs were John C. Cruden, Acting Assistant Attorney General, Environment and Natural Resources Division, and Evelyn Kitay, Office of the Counsel, Surface Transportation Board.

## OPINION

BRUGGINK, Judge.

Plaintiffs in this case are California landowners who claim to own fee interests in segments of a rail corridor. Their Fifth Amendment takings claims have been consolidated for the resolution of common issues of federal and California law. Pending are cross-motions for summary judgment. Oral argument was held May 31, 2002. The first question presented, whether plaintiffs indeed have fee interests in these segments, depends on whether the railroad obtained easements or held an interest in fee simple. If the plaintiffs hold fee interests, the court must determine whether the current "rail-banking" or interim trail use is within the scope of railroad easements under California law. For the reasons set out below, we find that the plaintiffs held the fee and that current uses are not within the uses permitted under the easements.

## BACKGROUND

In 1891 the San Joaquin Valley Railroad Company secured property interests in land as part of a plan to construct a railroad in Fresno County, California, by means of two very similar written instruments, both titled "Agreement for Right of Way." William Heim, whom plaintiff Meachum claims as his predecessor-in-interest, signed the following document ("Heim Deed"):

> I do hereby grant bargain sell and convey unto the said San Joaquin Valley Railroad Company the Right of Way for its proposed Railroad over [described section of the railroad corridor] owned by me in the County of Fresno in said State of California along the line of said proposed Railroad and for the side tracks turn tables depots water baths and other appurtenances wherever the same may be located by said Company to the extent of 100 feet in width along and across said lands as now [sic] located by the Engineers of the Company.

> Providing that if in any case said Right of Way is so located as to injure or damage any buildings fences ditches orchards or vineyards full compensation shall be made therefore.

> I further covenant promise and agree that when Railroad is completed over said lands I will thereupon execute and deliver to said San Joaquin Valley Railroad Company deeds or conveyances of said Right of Way. Said R.R. to be built within 12 months from date over said lands.

> Provided, however, that if said Railroad Company shall permanently discontinue the use of said railroad the land and Rights of Way shall at once revert to the undersigned.

> This agreement is to bind us and each of our heirs executors administrators and assigns.

On May 9, 1891, Charles H. Bouchey, whom the Toews plaintiffs claim as their predecessor-in-interest, signed a very similar document ("Bouchey Deed"), whose minor differences from the Heim Deed center on the passages emphasized above. Where the Heim Deed set a width of 100 feet across "said lands," the Bouchey Deed set a width of 50 feet from a "said West line." Another difference between the two deeds is that the Bouchey Deed lacked the sentence in the

third paragraph requiring the railroad to be built within twelve months.

Defendant contends that these grants constituted fee simple subject to a condition. Plaintiffs allege that these were merely railroad easements, subject to abandonment.

Railroad construction began on July 7, 1891. The railroad corridor at issue in this case ("subject corridor") is a 4.5 mile length of the Clovis Branch stretching from milepost 214.5 at Tarpey to milepost 219 at Glorietta Station. The subject corridor passes through what is now the downtown area of the City of Clovis, in Fresno County, California. Plaintiffs Menno and Evelyn Toews claim a portion of the subject corridor that is 50 feet wide and 382 feet long. Plaintiff Norman Meachum claims a strip of land within the corridor that is 100 feet wide and 220 feet long. On January 20, 1892, Southern Pacific ("SP") took over the corridor. In January, 1992, SP leased the corridor to a new entity also named the San Joaquin Valley Railroad Company ("SJVRC").

The process known as "railbanking" was initiated by Congress through the National Trails System Act Amendments of 1983 (Rails–to–Trails Act).[1] Under this regulatory scheme, a railroad company must first file with the Surface Transportation Board ("STB") either an application for abandonment pursuant to 49 U.S.C. §§ 10903 and 10904 (1994), or a petition for exemption pursuant to 49 U.S.C. § 10502. Once one of these filings has been submitted by a railroad, a third party interested in acquiring the rail line for "railbanking" and interim trail use must file with the STB a "Statement of Willingness to Assume Financial Responsibility." See 49 U.S.C. 1152.29(a). After such a filing by a third party, the railroad must notify the STB whether it is willing to negotiate a new agreement with the third party regarding the use of the railroad corridor. If the railroad is willing to negotiate, the STB will issue either a Notice of Interim Trail Use or Abandonment ("NITU") or a Certificate of Interim Trail Use or Abandonment ("CITU"). Either of these actions will postpone the STB's abandonment authorization for 180 days, during which the railroad can discontinue service and negotiate with interested third parties. If no agreement is reached, the railroad is authorized to abandon the rail line after the 180 day window has expired. If an agreement is reached within the 180 day window, the rail line is considered "railbanked," and the agreed upon interim trail use is permitted under the CITU or NITU.

On May 9, 1994, SJVRC filed a petition for an abandonment exemption for the 4.5 miles of track on the subject corridor pursuant to 49 U.S.C. § 10505 and 49 C.F.R. §§ 1121.1 et seq. The petition was granted by the STB.[2]

As early as 1993, in its "General Plan," the City of Clovis anticipated abandonment of the subject corridor and expressed an interest in taking control and developing it. On May 22, 1995, Clovis filed a request for a public use condition as well as an interim trail use condition. In a letter dated June 9, 1995, Clovis amended its request to exclude the right-of-way between Fifth Street, at or near milepost 217.3, and Third Street, at or near milepost 217.5. After negotiations, the subject corridor was conveyed to the City of Clovis, effective December 24, 1997. The excluded area between Fifth and Third Streets was purchased by a private business, the Clovis Investment Corporation.

The City of Clovis, the City of Fresno, and Fresno County issued a Clovis Avenue Railroad Corridor Area Plan ("CARCP") on October 22, 1996, which set out three phases of use for the subject corridor. Phase 1 would permit use of the corridor as a transitway for pedestrians, bicyclists, and skaters; Phase 2 would introduce equestrians and trolley buses; Phase 3 would bring light rail. Phase 1

---

1. Pub.L. 98–11, 97 Stat. 48, to the National Trails System Act, Pub.L. 90–543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §§ 1241 et seq. (Supp. II 1996)).

2. The STB ruled that, through the January, 1992, lease contract, SJVRC assumed SP's common carrier obligations over the Clovis Branch.

Therefore, SP did not "seek the abandonment of the Clovis Branch." See STB Consolidated Decision DOJ0195. Defendant concludes from this that the abandonment petition is irrelevant. We disagree. The STP treated the relevant party as SJVRC, the only party which could release a claim to be able to operate a railroad.

is currently in effect at the corridor, although equestrians-part of Phase 2–have been introduced. As part of the current "Phase 1" use, Clovis has dubbed the subject corridor the "Clovis Old Town Trail." The Trail includes a twelve-foot wide asphalt path lined with trees, benches, and commercial billboards. The Trail pauses between Fifth and Third Streets because a parking lot is located on what would be the excluded portion of the subject corridor. The Trail circumvents the parking lot by connecting the two disjointed ends with a sidewalk running alongside the rear of buildings fronting the lot.

The parcels claimed by plaintiffs have been fenced, planted with trees, and are subject to further landscaping plans pursuant to the CARCP. Clovis allows a variety of activities on the trail that would have been impractical and presumably prohibited while the subject corridor was a functioning railroad line, including bicycling, jogging, skateboarding, rollerblading, or doing anything that would be lawful in public space. Plaintiffs claim that when the subject corridor was a railroad line, only the SJVRC and the plaintiffs had access to their alleged property, whereas today, the general public has unlimited access for any lawful public purpose. The plaintiffs characterize the corridor as a "linear urban park," and claim it is no longer a "transportation corridor."

Defendant does not deny the current use, but asserts that walking, biking, skating, and horseback riding demonstrate that transportation is still the primary function of the subject corridor. According to the defendant, the fact that Clovis has provided landscaping, benches, and water fountains for the convenience of travelers does not affect the corridor's main purpose of facilitating travel, and the fact that the mode of transportation has changed is irrelevant. Furthermore, defendant asserts that the subject corridor's present use is the first stage of a greater plan envisioning multi-modal transportation that some day could include buses and light rail.

## DISCUSSION

The first question is whether the Heim and Bouchey Deeds conveyed railroad easements or fee simple subject to a condition. We conclude that it is clear under California law that the railroads obtained only easements.

■ Each deed is titled "Agreement for Right of Way." We note "... the general rule ... that in construing contracts and deeds for railroad rights of way such deeds are usually construed as giving a mere right of way, although the terms of the deed would otherwise be apt to convey a fee." *Highland Realty Co. v. City of San Rafael*, 46 Cal.2d 669, 298 P.2d 15 (1956). The California Supreme Court went further in *City of Manhattan Beach v. Superior Court*, 13 Cal.4th 232, 52 Cal.Rptr.2d 82, 914 P.2d 160 (1996), ruling that "when the granting clause of a deed declares the purpose of the deed to be a right of way for a railroad the deed passes an easement only, and not a fee with a restricted use, even though the deed is in the usual form to convey a fee title." *Id.* at 240, 52 Cal.Rptr.2d 82, 914 P.2d 160. Also supporting the conclusion that the deeds conveyed railroad easements are the following facts: Cal. Civ.Code § 801 (2001) defines a right-of-way as a type of easement, the deeds were executed for nominal consideration, the deeds do not speak broadly in terms of "remise, release, or quitclaim," and language of purpose is included.

■ Defendant points to the reversion clauses ("that if said Railroad Company shall permanently discontinue the use of said railroad the land and Rights of Way shall at once revert to the undersigned deeds") and the use of the word "land" in both deeds as evidence of an intent to convey a fee simple determinable. We disagree. In *Moakley v. Los Angeles Pacific Ry. Co.*, 139 Cal.App. 421, 423–26, 34 P.2d 218 (1934), a deed containing similar reversion language and an even more troubling use of the term "land" was found to convey an easement to a railroad. As explained in *Brown v. Weare*, 348 Mo. 135, 152 S.W.2d 649 at 655 (1941), the use of the term "revert" in an easement, although confusing, is consistent with the parties' typical assumption that, if the easement is no longer used, then the burden on the fee is lifted. Similarly, the use of the word "land" does not overcome the presumption of an easement. An easement is imposed on land, so it is not surprising that the

drafter might use the term with no purpose of altering the nature of the conveyance. We have considered defendant's other arguments and find them unpersuasive.

■ Although not necessary to the result, we believe it is clear that there was an abandonment here of the easement by the railroad. The documentation supporting SJVRC's petition to abandon, coupled with the granting of the permit (albeit subject to the Rails to Trails designation), the removal of all the track, and the creation of the trail makes it clear that the original use is at an end with no remote prospect of resuscitation. There have plainly been "unequivocal and decisive acts ... clearly showing an intention to abandon." · *See Gerhard v. Stephens*, 68 Cal.2d 864, 882, 69 Cal.Rptr. 612, 442 P.2d 692 (1968).

Defendant contends that there was no abandonment because the current use as a park/trail is consistent with the purposes of the original easement, broadly stated. It argues for an expansive reading of the term "railroad" use. It relies on the argument that "[a] right of way or easement granted to a railroad 'is not that spoken of in the old law books, but is peculiar to the use of a railroad which is usually an improvement, a perpetual highway of travel and commerce' ...." *San Gabriel v. Pac. Elec. Ry. Co.*, 129 Cal.App. 460, 464–65, 18 P.2d 996 (Cal.Dist.Ct.App. 1933). Changing uses are possible, so long as it can be determined that the new use is within the contemplation of the original grant:

> Our courts have been receptive to the contention that changed economic and technological conditions require reevaluation of restrictions place upon the use of real property and may render legally inoperative certain changes in use which would otherwise require a reversion.

*Faus v. City of Los Angeles*, 67 Cal.2d 350, 355, 62 Cal.Rptr. 193, 431 P.2d 849, 852 (1967). Thus, a shift from railroad to bus use has been permitted, *Faus,* as well as a shift from use as a street to a railroad use, *Montgomery v. Santa Ana & Westminster Ry.,* ·104 Cal. 186,·37 P. 786 (1894). The court in *Montgomery* grounds this shifting use in the following rationale:

> The world moves .... The trend of judicial opinion ... is to a broader and more comprehensive view of the rights of the public in and to the streets and highways ... and, while carefully conserving the rights of individuals to their property, the courts have not hesitated to declare the shadowy title which the owner of the fee holds to the land in a public street or highway, during the duration of the easement of the public therein, as being subject to all the varied wants of the public, and essential to its health, enjoyment and progress.

104 Cal. at 192, 37 P. 786. While we find nothing shadowy about the fee interest held by plaintiffs here, we take the point: changed economic and technological conditions may dictate that the original use contemplated has evolved into something markedly different, and yet within the original general purposes. ·

That is not what occurred here, however. Changed economic conditions lead to the abandonment of the railroad. In no sense was there an evolution in use by the grantee. That, by itself, would normally dictate a return to the fee owner's use. The "technological" change is, moreover, retrograde. That walking, jogging, skateboarding, are less technologically complex than running a railroad hints at what the real change here is. The shift is not from an uneconomic form of transportation to a more efficient, high-tech version. Rather, the use is different in kind. The purpose is fundamentally recreational, not the movement of goods or people in commerce. In the past, plaintiffs' land was subject to the isolated passage of a freight train. Now their land is available to any member of the public for any legal purpose. The current use, a linear park, is, in short, fundamentally different in kind than a railroad purpose. *Accord Pollnow v. Wisconsin,* 88 Wis.2d 350, 276 ˙N.W.2d 738 (1979). Hence a new easement has been imposed irrespective of railbanking. *See ˚ Locklin v. City of Lafayette,* 7 Cal.4th 327, 356 n. 17, 27 Cal.Rptr.2d 613, 867 P.2d 724 (1994). Nor is that result altered by Congress' words to the contrary: "such interim use shall not be treated, for purposes of any law or rule of

law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d) (1994). While Congress may have the power to block control by plaintiffs of their own land, it can only do so constitutionally by paying for the privilege. *See Glosemeyer v. United States,* 45 Fed.Cl. 771, 781–82 (2000).

Finally, as we held above, the possibility that city planners hope one day to institute light rail service, does not affect the result. Not only is the evidence here inconsistent with such use as a meaningful, much less imminent, possibility, the sale of a portion of the right of way in the middle of Clovis makes such an event even more remote.

## CONCLUSION

The deeds at issue constituted grants of railroad easements. Those easements were abandoned by the railroad. Whether abandoned or not, however, the plaintiffs' underlying fee interests are now burdened with new easements. Accordingly, defendant's motion for summary judgment is denied. Plaintiffs' motion for summary judgment is granted. The parties are directed to consult in order to prepare a joint status report, to be filed on or before August 23, 2002, proposing further pretrial activities.