Menno TOEWS, Evelyn Toews, and Norman Meachum, Plaintiffs–Appellees,

v.

UNITED STATES, Defendant–Appellant.

No. 03–5129.

United States Court of Appeals, Federal Circuit.

July 21, 2004.

Robert J. Rosati, of Fresno, CA, argued for plaintiffs-appellees.

John L. Smeltzer, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Thomas A. Sansonetti, Assistant Attorney General, William J. Shapiro and Katherine J. Barton, Attorneys. Of counsel on the brief was Evelyn Kitay, Office of the General Counsel, Surface Transportation Board, of Washington, DC. of counsel was

Kelly A. Johnson, Deputy Assistant Attorney General.

Kevin M. Sheys, Kirkpatrick & Lockhart LLP, of Washington, DC, for amicus curiae Rails–to–Trails Conservancy. Of counsel on the brief was Janie C.I. Sheng.

Before BRYSON, Circuit Judge, PLAGER, Senior Circuit Judge, and LINN, Circuit Judge.

PLAGER, Senior Circuit Judge.

This is a takings case, requiring us to address the impact of the Rails–to–Trails program on the affected landowners. Plaintiffs Menno and Evelyn Toews and Norman Meachum are California property owners who own fee simple interests in segments of an unused railroad right of way. The right of way has been converted to a public recreational trail under the authority of federal legislation known as the Rails–to–Trails Act.[1] Plaintiffs filed complaints in the United States Court of Federal Claims seeking just compensation for the alleged taking of their property in violation of the Fifth Amendment of the Constitution.[2] The trial court granted plaintiffs' motion for summary judgment on liability and denied the Government's cross-motion for summary judgment.[3] The Government appeals the adverse judgment. We affirm the judgment of the trial court.

## BACKGROUND

Plaintiffs in this case own property in fee simple located in the City of Clovis in Fresno County, California. In 1891, the San Joaquin Valley Railroad Company acquired rights of way from plaintiffs' prede-

---

1. National Trails System Act Amendments of 1983, Pub.L. No. 98–11, § 208, 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d) (2000)).

2. "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

3. *Toews v. United States,* 53 Fed.Cl. 58 (2002).

cessors-in-interest and other landowners for the purpose of operating a rail line, known as the Clovis Branch, between the City of Clovis and the City of Fresno.

Menno and Evelyn Toews are successors-in-interest to Charles H. Bouchey, who executed an "Agreement for Right of Way" containing the following pertinent language:

I do hereby grant bargain sell and convey unto the said San Joaquin Valley Railroad Company the Right of Way for its proposed Railroad over West line of [land parcel] owned by me in the County of Fresno in said State of California along the line of said proposed Railroad, and for its side tracks, turn tables depots water tanks and other appurtenances where the same may be located by said Company to the extent of 50 feet on said West line in width along and across said lands as now located by the Engineer of the Company.

. . .

Provided, however, that if said Railroad Company shall permanently discontinue the use of said railroad the land and Rights of Way shall at once revert to the undersigned.

This agreement is to bind us and each of our heirs executors administrators and assigns.

Norman Meachum is successor-in-interest to William Helm, who also executed an "Agreement for Right of Way" with the railroad company. The written instrument is identical to the Bouchey deed except that it describes a different parcel and a right of way of "100 feet in width."

Over time the land burdened by the rights of way passed through the hands of successors-in-interest. In 1951 Menno and Evelyn Toews purchased land that had been part of the property once owned by Bouchey. The railroad right of way lies within the western edge of their property and is 50 feet wide and approximately 384 feet long. In 1958, Meachum's parents purchased a portion of the Helm property, which had been subdivided. Meachum now owns in fee the parcel purchased by his parents. The disputed right of way lies within the eastern edge of Meachum's property and is 50 feet wide and approximately 229 feet long.

The San Joaquin Valley Railroad Company began construction on the Clovis Branch in July 1891 and commenced freight service in October of that year. Not long after, the Southern Pacific Railroad purchased all interests in the rail line and operated it for nearly a century. In 1992, at a time when nearly all service on the rail line had terminated, Southern Pacific leased its interests in the line to a new and different San Joaquin Valley Railroad Company ("SJVR").

In May 1994, SJVR filed with the Interstate Commerce Commission ("ICC") a petition for an "abandonment exemption" pursuant to 49 U.S.C. § 10505 (1988),[4] seeking the right to discontinue operations on a 4.5–mile segment of the Clovis Branch between milepost 214.5 at Tarpey and milepost 219 at Glorietta Station. The ICC granted the petition in April 1995 and published a notice of exemption in the Federal Register, triggering the public right to seek interim trail use in accordance with the 'railbanking' procedures of section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d) (2000).

4. The substantive provisions of section 10505 were moved to 49 U.S.C. § 10502 (2000) as part of the legislation that abolished the ICC and established in its place the Surface Transportation Board ("STB"). *See* ICC Termination Act of 1995, Pub.L. No. 104–88, § 102, 109 Stat. 803, 808–09.

The City of Clovis, which as early as 1993 had begun planning for future uses of the railroad right of way, sent a May 1995 letter to the ICC requesting that the ICC impose a public-use condition for interim trail use on abandonment of the 4.5–mile segment of the rail line; the letter also indicated that the city would assume responsibility and liability for the line during interim use. The city subsequently amended its request to exclude a 0.2–mile section that Southern Pacific had agreed to sell as part of a larger parcel to a private business.

In October 1995 the ICC issued a Notice of Interim Trail Use or Abandonment ("NITU") for the 4.5–mile segment, minus the 0.2–mile excluded portion. The NITU authorized the implementation of interim trail use and railbanking if the City of Clovis could reach an interim-use agreement with SJVR and Southern Pacific, which still owned the right of way, within 180 days; the NITU also authorized SJVR to discontinue service and salvage track and related materials.

Meanwhile, SJVR had begun removing tracks, ties, and equipment from the rail corridor. By July 1995 all tracks and ties, except those in street crossings, had been removed.

After several extensions of the negotiating period, the parties reached an agreement for interim use. Effective December 24, 1997, the railroads conveyed to the City of Clovis by quitclaim deed their interests in the right of way between mileposts 214.5 and 219.0, minus the excluded portion, which had been expanded to a 0.5–mile section between mileposts 217.2 and 217.7.

During the negotiation period, the City of Clovis stepped up its plans for use of the railroad right of way. In February 1996, the City of Clovis, along with the City of Fresno and the County of Fresno,

executed a Memorandum of Understanding regarding the abandonment of area rail lines, including the Clovis Branch. The parties agreed that in the near term, the rail corridor would be "developed with pedestrian, equestrian and bike paths." In the long term, the agreement provided, the corridor "may also accommodate transit in addition to pedestrian and bike paths. Transit is understood to mean local rail, light rail, or other transit modes."

In October 1996, the City of Clovis issued a final Clovis Avenue Railroad Corridor Area Plan ("the CARCP"), which set out three phases for development of a "linear public space" along the subject corridor. The plan provided for near term use by pedestrians, bicyclists, and skaters; development in the intermediate term to accommodate equestrian use and trolley bus service; and a "potential conversion" to light rail in the long term.

After the City acquired the railroads' interests in 1997, the City entered the first development phase by establishing the Clovis Old Town Trail, which consists of a twelve-foot wide paved path along the former railroad right of way. Today the trail is lined with trees planted on both sides and amenities common to recreational trails, such as park benches, water fountains, and bicycle racks. Commercial billboards have been placed along the trail. The City of Clovis allows a variety of activities on and alongside the trail, including bicycling, walking, jogging, skateboarding, rollerblading, playing ball, picnicking, and other activities that would be lawful in a public space. At this time, the City has not pursued the establishment of trolley bus service, and does not anticipate that light rail will be economically viable during the 20– or 30–year timeframe covered by the CARCP.

Plaintiffs allege that when the subject corridor was a functioning railroad line, they could use the land so long as the use was not inconsistent with the railroad's use. That is no longer the case. Since the City of Clovis acquired the former railroad interests, the City has erected a fence to separate the portion of the right of way on the Toews property from the remainder of their property and has planted trees on the right of way. The City also required their tenants, who had farmed the property, to remove their fruit stand from the railroad corridor; the tenants subsequently terminated their lease. The City plans to landscape the section of the trail that includes the right of way on the Meachum property after completing construction of a tunnel. Plaintiffs further claim that when the railroad was operational, only the SJVR and the plaintiffs had access to the right of way, whereas now the general public has unlimited access and may use the land for any lawful public purpose.

Plaintiffs filed separate Tucker Act[5] complaints in the Court of Federal Claims seeking just compensation under the Fifth Amendment for the alleged taking of their property. After the trial court consolidated the two cases, the parties filed cross-motions for summary judgment on liability. Following oral argument, the trial court concluded that the Government's regulatory actions effected takings. *Toews v. United States*, 53 Fed. Cl. 58 (2002). The court held that the original landowners granted easements to the railroad rather than estates in fee. *Id.* at 61. The court concluded that, as a matter of California law, the interim trail use by the City of Clovis is not within the scope of the easements. *Id.* at 62–63. The court also determined that, under California law, the SJVR had abandoned the easements, although the court noted that this conclusion

was not necessary to the result in the case. *Id.* at 62.

The parties thereafter entered into a joint stipulation as to the amount of just compensation, and the trial court entered final judgment for the plaintiffs. The Government appeals; we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2000).

## DISCUSSION

### 1.

■ The Government asserts that the trial court erred in three respects. First, the Government contends that, as a matter of California law, use of these railroad rights of way for railbanking and interim use as a recreational trail did not go beyond the scope of the easements. Further, it is the Government's view that, under California law, there was no abandonment or extinguishment of the easements caused by the federal actions under § 8(d) of the National Trails System Act. And thirdly, the Government states that these questions should not be subject to decision by the federal courts but should be referred to the California courts for resolution.

We address first the question of whether there was an abandonment of these easements for railroad purposes by the railroad, either on its own initiative or in response to the federal actions. This question implicates a complex of considerations. There is the history of the several railroads that, for whatever reasons, from time to time terminated their service on the line, and sold the rail line; there is the role that economics and current development patterns in Clovis play in the thinking of a railroad's management regarding the feasibility of providing rail service on this line; there is the timing of the rail-

---

**5.** 28 U.S.C. § 1491(a) (2000).

road's termination of service on the line and the removal of the tracks and associated facilities; and finally there is the speculative nature of a plan for a many-years-hence light rail line in a community this size.

After consideration of these factors, the trial court concluded that, as a factual matter, the railroad's management had acted in an unequivocal and decisive manner clearly showing an intention to abandon that section of the line. Given the relevant factors, it is difficult to say that the trial court's conclusion is erroneous; it is not difficult to say that the Government's argument to the contrary is less than persuasive. However, just as the trial court itself indicated that its conclusion in this matter was not necessary to the result reached, for the reasons that follow we need not definitively decide this issue either.

The defining issue in this case is the question of the scope of the easements originally granted to the railroad. The grants that created these easements stated that what was sold to the San Joaquin Valley Railroad Company was a "Right of Way for its proposed Railroad." The grants expressly included authorization for side tracks, turntables, depots, and other railroad uses (limited to the width of the granted right of way).

There was a provision in the grants that if the Railroad Company permanently discontinued the use of the railroad, the land and rights of way "shall at once revert to the undersigned" landowner. After evaluating the entire deeds of grant, the trial court held that these grants constituted easements and not fee simple transfers. This is undoubtedly correct, and on appeal neither party has challenged that holding. We note in passing that as a matter of traditional property law terminology, a termination of the easements would not cause

anything to "revert" to the landowner. Rather, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden.

■ It is elementary law that if the Government uses (or authorizes the use of—a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation—the railroad cannot give what it does not have.

And it appears beyond cavil that use of these easements for a recreational trail—for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.

Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's

grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject. The Government does not dispute this proposition—the Government agrees that, consistent with the state's law, the landowner's grant defines the burden with which the land is burdened.

But, argues the Government, California law reads into the original grant the kind of change in a granted railroad easement seen here. The argument goes this way: a railroad easement is a "public" right of way for transportation; California law permits changes in public transportation uses, citing in particular the California cases of *Faus v. City of Los Angeles*, 67 Cal.2d 350, 62 Cal.Rptr. 193, 431 P.2d 849 (1967), and *Wattson v. Eldridge*, 207 Cal. 314, 278 P. 236 (1929); the change to interim trail use involved here thus is consistent with the original grants, and thus as a matter of law cannot be considered to impose a greater burden than that imposed by railroad use.

The plaintiff landowners respond that use of these rights of way as a recreational trail and linear park is fundamentally different in kind than a railroad use; such use does not comply with the purposes of the grantors; the burden imposed by such a use is different in degree and nature, citing *Preseault v. United States*, 100 F.3d 1525, 1542–43 (Fed.Cir.1996) (en banc); and thus the use constitutes a new easement under California law, not a continuation of an existing one.

### 2.

The Government's argument that a railroad's use of an easement may transmogrify into the public's use as a recreational trail and linear park stands on a doctrine sometimes referred to as the 'shifting public use' doctrine. California's application of this doctrine is illustrated by the two cases noted above, heavily cited and relied upon by the Government.

In *Faus v. City of Los Angeles*, 67 Cal.2d 350, 62 Cal.Rptr. 193, 431 P.2d 849 (1967), the question was whether public motor coach service could be substituted for public electric railway service over rights of way that were granted for an electric railway. The terms of the original grants, all dating from the 1901–1911 period, are not set out in the opinion in haec verba, though relevant snippets and summaries are given. It appears that the grants were for easements for an electric railway or streetcar, and that the streetcars were to provide local and express service from the residential communities involved into downtown Los Angeles. Various conditions were included in the grants to ensure that regular service was provided, and several of the deeds explicitly provided that if railway service ceased for six months there would be a "reversion" of the land.

In the course of time, and with the consent of the railroad company and in some cases the adjacent homeowners, the City of Los Angeles paved longitudinal strips in the easement alongside the tracks for use as local streets. Finally, in 1955, an arrangement was made under which the railroad company ceased train service and the City substituted motor coach service along the same routes (it is unclear whether the railroad's rights in the easements were assigned to the City, but presumably so). The City then took title to the underlying land by condemnation, paved over the areas where the tracks had been and combined them with the adjoining road network.

The court's opinion indicates that the heirs of the original easement grantors were not named in the condemnation proceedings, although why this is so is not

explained. Plaintiff Faus located the heirs of the original grantors, acquired whatever rights they had, and, alleging that the City's use of the property violated the conditions contained in the original grants, sued the City for the heirs' damages for the taking. The trial court gave judgment for Faus.

In three earlier cases before the California appellate courts in other settings but on similar facts, Faus had been successful. The California Supreme Court apparently thought that three was enough, and reversed the lower court. The essential holding of the California Supreme Court was that the original grantors' purpose was to ensure that the inhabitants of the properties which the grantors wished to subdivide would enjoy the best means of interurban public transport which was feasible, and that over time technological change produced a situation in which motor buses won public preference because of their greater flexibility of route and schedule. As the court put it, "[p]laintiff has not suggested that the bus service provided over the roads which now occupy the former railroad right of way affords less satisfactory means of public transport for the adjacent landowners than that previously supplied by the streetcar network." *Id.* at 852. In the court's view, public transport, whether by rail or bus, was within the intention and purpose of the original grantors, and had they been able to conceive of the changed circumstances they would have provided for it.

The other case on which the Government bases its argument is *Wattson v. Eldridge*, 207 Cal. 314, 278 P. 236 (1929), which preceded *Faus* by almost forty years. In 1905 a land developer acquired a tract of marshland in Los Angeles County, created a subdivision with interconnecting canals that led to an artificial lagoon connected to the ocean, and called this creation 'Venice of America.' The adjacent properties were developed for residential uses.

In 1912 the developer conveyed the land underlying the waterways to the City of Venice "for permanent waterways, and canals, free to the public forever." *Id.* at 237. In 1925, the city of Venice consolidated with the city of Los Angeles. Not long afterward, Los Angeles decided to fill in the canals and make them into roads. The case arose when the contractor who was the successful bidder on the road-building project petitioned for a writ of mandamus to compel the city's Board of Public Works to execute the contract he had won. The District Court of Appeal refused the writ; the California Supreme Court granted it.

The court found that it was undisputed that the canals had been maintained by the developer and later by the city of Venice as waterways open to free use by the public generally and by the owners and occupants of premises in the subdivision for boating, bathing and swimming, for purposes of pleasure and recreation, and also for transportation of household goods and supplies. The record also showed that the canals were used for transportation of passengers for hire in launches.

In support of its refusal to grant the contract, the Board put forward the position that the municipality was without authority to divert the canals to land areas because of the general proposition that land dedicated to a definite and specific purpose should not be diverted to any other purpose. The court agreed with the general proposition, but noted that the dedication "must be understood and construed with reference to its primary object and purpose." *Id.* at 238. The court concluded that the builder of the project intended the canals to serve "primarily as highways over which persons resident therein and the public generally might

pass.... [A] canal is a highway of a peculiar kind.... The dedication of a highway to public use authorizes any ordinary use for highway purposes." *Id.* at 239 (citations omitted). Accordingly, the City of Los Angeles, as successor owner of the canals, had the right to make them into dry rather than wet highways.

The Board also raised the point that perhaps the adjacent property owners who bordered on the canals might have vested rights that would require acquisition. The court responded that the adjacent property owners had no grounds for complaint. The canals were artificial waterbodies, and "it is difficult to conclude what interest has been vested in these lot owners which might be subjected to monetary appraisal." *Id.* Thus, the unusual context in which the question of the city's right to fill the canals was raised—a suit by the contractor who was hired to fill them—had the happy result of disposing of any potential riparian rights claims without the adjacent landowners even being party to the suit.

What can we gather from these two cited cases? Putting aside the California court's broad generalizations about making changes in response to changing circumstances, language with which these cases are larded and which, lifted out of context, makes it appear that in California anything goes, the rule applied in these cases is quite limited, and in that sense unremarkable. *Faus* holds that an easement for a streetcar that runs on a track can include a motor bus running on a pavement. The bus performs the same function in essentially the same way with the same result. The grantors' purpose is thus protected and carried forward, despite the change in mechanical technique; the easement for local transportation remains fulfilled.

*Wattson* is not actually an easement case at all, but is a dedication case with riparian overtones. The canals, or more properly the lands beneath the canals, were owned by the City. The City decided to fill the land and use it for a highway. The court found that the original dedication for use as a canal was indeed for a highway, peculiar though it was, and thus the new use was consistent with the original use, and consistent with the grantor's intention and purpose. And the property owners who bought into the Venice of America were left high and dry.

■ We agree with the Government that these two cases reflect the position of the California courts regarding the so-called shifting use doctrine. The Government by quoting from the language of the cases finds broad authority to transmogrify one kind of easement into another. We find in these cases when put in their proper context a consistent and appropriately narrow theme: a right of way for public transportation uses, initially defined in terms of a specific form of public transport (railroad trains or boats) may, under proper circumstances, be taken to include other mechanical methods for public transport (buses or cars), so long as the change is consistent with the grantor's purpose and general intention.

Applying that narrow theme to the case before us, it is clear that under the rule as it is applied in California a public transportation easement defined as one for railroad purposes is not stretchable into an easement for a recreational trail and linear park for skateboarders and picnickers, however desirable such uses may be for these linear strips of land. The Government has the legal power and is thus free to impose such new uses upon the fee interests held by the adjacent landowners. But the private property interests taken are not free; the Government must pay the just compensation mandated by the Constitution.

### 3.

■ The Government finally argues that this conclusion should be deferred until the California courts have had opportunity to opine on the matter. The Government cites two cases from this court in which the same issue we have here arose. In one, in which the question was Maryland law, we made just such a reference. *See Chevy Chase Land Co. v. United States*, 158 F.3d 574 (Fed.Cir.1998) (certification order); *Chevy Chase Land Co. v. United States*, 355 Md. 110, 733 A.2d 1055 (1999) (answer); *Chevy Chase Land Co. v. United States*, 230 F.3d 1375 (table), 1999 WL 1289099 (Fed.Cir.1999) (nonprecedential) (final disposition). Maryland, like California, makes provision for a federal court of appeals to certify questions of state law to the state court. In the other case, in which the question was Vermont law, *Preseault v. United States*, 100 F.3d 1525 (Fed.Cir.1996) (en banc), we noted the desirability of such a reference when it is available if the question of the state's law is in doubt; however, Vermont did not provide for certification.

In the *Chevy Chase* case, the deed of grant to a railroad was for "a free and perpetual right of way." That broad language, non-specific in the nature or scope of the use, and the circumstances leading up to the conveyance, as well as subsequent events, left this court in doubt whether the grant was for an easement for railroad use or for a fee simple estate, and, if an easement, whether it could include a recreational trail within its terms. There was also a difficult factual issue as to whether the right of way had later been abandoned. We certified those questions to the Maryland Court of Appeals, and got their answer.

In *Preseault*, we again were confronted with the question whether the original transfer (by a 'Commissioner's Award,' not a deed of grant) was an easement or a transfer of a fee estate; whether, if there was an easement, it had been abandoned, and if not, whether a recreational trail came within the scope of the awarded easement. We noted that in light of the unclear state of the common law and statutes of Vermont then in effect, ideally we would have the benefit of the Vermont courts' view of their law. However, in earlier litigation the state courts had declined to opine on the subject, deeming it a federal matter. And there was no mechanism for certification. Thus we proceeded to decide the case based on the law as best we could discern it.

In both *Chevy Chase* and *Preseault* there was real doubt about the state's law on one or several of the issues to be decided. In *Chevy Chase*, the unusual breadth of phrasing of the conveyed interest left open the question of what was conveyed and what did it mean. Nothing in Maryland law suggested a clear answer. In *Preseault*, the conveying document was obscure, and there was an absence of any Vermont law even remotely on point. A majority of the en banc court concluded that the easements created by the grant under Vermont law were not broad enough to encompass a recreational trail, and in any event the trial court was correct in concluding that the easement had been abandoned earlier.[6]

---

6. Since there was a written concurrence by two of the majority judges, the Government throughout its brief insists on referring to the opinion of the en banc court in *Preseault* as a "plurality" opinion, presumably to weaken its precedential value. Even a cursory reading of the concurrence shows that there was no disagreement on any of the issues, as well as on the result. Whether denominated as a 'concurrence' or as 'additional views,' an appellation used in other cases under similar circumstances, the holding of the case reflects

The case before us stands on a quite different footing. The terms of the deed of grant are explicit, and phrased in traditional railroad right of way terms. The trial court properly found the grant to constitute an easement, and that is neither in doubt nor challenged. The California Supreme Court has specifically addressed the question of ·shifting use in transportation easements, and in thorough opinions, as we have described, explained its rationale. We are left with no doubt as to the proper application of the state's law to these facts. The Government's reading of that law is not supported by the California cases.

Furthermore, courts have a duty to decide the cases before them whenever it reasonably can be done. Basic fairness, avoidance of unwarranted delay and the imposition of additional costs on the parties, and conservation of judicial resources, all dictate that we should decide this case since on the law we can. We decline the Government's invitation to ˙do otherwise.

In Sum. We have concluded that the trial court correctly found the scope of the easement not to encompass the new use as a recreational trail. As a result of the imposition of the recreational trail and linear park, the easement for railroad purposes was converted into a new and different easement. The references in the ICC's and the City of Clovis's various documents to railbanking and the possibility that one day the railroad easements might be used for a light rail system do not change the analysis. There is a reality test in takings law. It is clear from the record that for the foreseeable future these lands will be used for the recreational trail project. Whether there ever will be a light rail system or other railroad service over these paved routes in Clovis is a matter of speculation about the distant

future, based on uncertain economic and social change, and a change in government policy by managers not yet known or perhaps even born. Such speculation does not provide a basis for denying protection to existing property rights under the Constitution. In the circumstances, it is unnecessary for us definitively to address the question of whether there had been an earlier abandonment of the easement, a point we need not decide to uphold the judgment below.

4.

One final matter remains to be disposed of. In its "Statement of the Issues" on appeal, the Government identified the three issues it claimed the trial court decided in error: abandonment, scope, and certification to the California courts. We have addressed these issues. However, in its brief and during oral argument, the Government argued in addition that, whatever the scope of the easements, if it was exceeded by the way in which the new use as a recreational trail was implemented, that was a consequence of what the City of Clovis did, since Clovis actually established the trail, and thus it was not the responsibility of the United States.

There is an open question whether that argument is before us, since it was not identified as an issue on appeal. No matter, it is a meritless argument. We were confronted with that same argument in *Preseault*, and before that in another takings case involving federal authorization of state action, *see Hendler v. United States*, 952 F.2d 1364, 1378–79 (Fed.Cir.1991). In both cases we gave the argument short shrift. As we said in *Preseault*, "when the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Govern-

the considered view of a substantial majority    of the court.

ment acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions." 100 F.3d at 1551. That proposition on these facts is more than enough to hold the Federal Government responsible for the immediately foreseeable consequences of its actions. We do not have before us the question of whether, as the grants · are currently written, a recipient under a section 8(d) grant has any contractual liability to the Federal Government for exceeding the terms of an existing easement, and offer no opinion on that question.

## CONCLUSION

The trial court did not err in its judgment, which is

*AFFIRMED.*