**RENEWAL BODY WORKS, INC.,
a corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 03–2809L.

United States Court of Federal Claims.

April 1, 2005.

Robert J. Rosati, Fresno, CA, for plaintiff.

William J. Shapiro, Trial Attorney, Environment & Natural Resources Division, Thomas L. Sansonetti, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on Defendant's Motion for Judgment on the Pleadings. Plaintiff filed an Opposition, to which defendant filed a Reply. Oral argument was deemed unnecessary. For the reasons set forth below, defendant's motion, treated as a motion to dismiss for lack of subject matter jurisdiction, is GRANTED.

## BACKGROUND

### I. Facts

All of the facts set forth herein are either undisputed or alleged and assumed to be true for purposes of the pending motion. Plaintiff, Renewal Body Works ("Renewal"), is a corporation controlled by members of the Sandoval family. Compl. ¶ 5. Renewal owns certain real property located at 711 West Shaw Avenue in the City of Clovis, County of Fresno, State of California. *Id.* Members of the Sandoval family, in their individual capacities, first acquired this land in 1944. *Id.*

A predecessor-in-title to plaintiff's property granted an easement for a 50 foot wide railroad right-of-way across the west side of the property to San Joaquin Valley Railroad Company in 1891. Compl. ¶ 6A, Ex. A–1, Ex. A–2. The easement provided that "if said Railroad Company shall permanently discontinue the use of said railroad the land and Right of Way shall at once revert to the undersigned." Compl. ¶ 6B, Ex. A–1, Ex. A–2.

After constructing the railroad, the San Joaquin Valley Railroad Company sold its interest in the line to the Southern Pacific Transportation Company ("SPT"). Compl. ¶ 7; *see also Toews v. United States,* 376 F.3d 1371, 1373 (Fed.Cir.2004).[1] SPT leased its interest in the line to a new and different San Joaquin Valley Railroad Company ("SJVR") in 1992. Compl. ¶ 13; *see also Toews,* 376 F.3d at 1373. In 1994, SJVR decided to discontinue use of the railroad. Compl. ¶ 7.

In order to abandon the railroad, SJVR was required to file either an "abandonment

---

1. This action involves the same railroad line involved in *Toews* and the same material easement provisions involved in *Toews.* Furthermore, Re- newal's property is located within two miles of both of the parcels involved in *Toews.* Decl. of Robert J. Rosati ¶¶ 6–8; Joint Mot. to Stay ¶ 4.

application" or seek an "abandonment exemption" with the Interstate Commerce Commission ("ICC"),[2] the regulatory body governing the operation and abandonment of the line. *Caldwell v. United States,* 391 F.3d 1226, 1228 (Fed.Cir.2004).[3] SJVR filed for an abandonment exemption. Compl. ¶¶ 7, 8; *see also Toews,* 376 F.3d at 1373.

The ICC granted the application, and SJVR was allowed to abandon service on a 4.5–mile segment of the rail line on May 28, 1995. Compl. ¶ 8. This segment included the portion of the right-of-way owned by plaintiff. Compl. ¶¶ 12, 17. By granting SJVR's abandonment exemption application, the ICC triggered the right of interested parties to negotiate with SJVR for use of the right-of-way pursuant to the National Trails System Act, Pub.L. No. 90–543, 82 Stat. 919 (1968) (codified as amended at 16 U.S.C. § 1241 *et seq.*) ("Rails–to–Trails Act").[4]

On or about May 22, 1995, the City of Clovis, California, requested that the ICC issue a "public use condition for interim trail use," rather than authorize an outright abandonment of the right-of-way. Compl. ¶ 9.[5] As required by the Rails–to–Trails Act's implementing regulations, the city expressed its willingness to assume responsibility and liability for the property as well as pay all taxes associated with the property during interim use. Compl. ¶ 10; *see also* 49 C.F.R. § 1152.29(a)(2) (2004). The city further acknowledged that the ICC would retain jurisdiction over the right-of-way for possible future railroad service. Compl. ¶ 10; *see also* 49 C.F.R. § 1152.29(a)(3).

SJVR and SPT agreed to negotiate with the city. Compl. ¶ 10. The ICC issued a Notice of Interim Trail Use ("NITU") for the 4.5–mile segment of the railroad on October 13, 1995.[6] Compl. ¶ 11. The NITU author-

2. The ICC was abolished and replaced by the Surface Transportation Board ("STB") pursuant to the ICC Termination Act of 1995, Pub.L. No. 104–88, § 201(a), 109 Stat. 803, 933 (codified at 49 U.S.C. § 702).

3. In order to abandon a right-of-way within the STB's jurisdiction, a railroad can either file a standard abandonment application pursuant to 49 U.S.C. § 10903 or seek an abandonment exemption pursuant to 49 U.S.C. § 10502. *Caldwell,* 391 F.3d at 1228. An abandonment authorized pursuant to an exemption under 49 U.S.C. § 10502 is less involved than the standard abandonment procedure under 49 U.S.C. § 10903. *Id.* at 1229 n. 2. "In practice, exemption proceedings are appropriate if no local traffic has run on the line in at least two years." *Id.*

4. The Rails–to–Trails Act offers an alternative to outright abandonment of railroad lines through a process known as "railbanking." *Caldwell,* 391 F.3d at 1229. Railbanking allows an interested party to convert an unused railroad right-of-way into a recreational trail notwithstanding any reversionary property interest that may exist pursuant to state law. As explained by the Supreme Court in *Preseault v. ICC,*

> a railroad wishing to cease operations along a particular route may negotiate with a State, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way. If the parties reach agreement, the land may be transferred to the trail operator for interim use, subject to ICC-imposed terms and conditions; if no agreement is reached, the railroad may abandon the line entirely and liquidate its interest.

494 U.S. 1, 6–7, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).

5. Under the Rails–to–Trails Act, after a railroad files an abandonment application or a request for an abandonment exemption, an interested party may file a railbanking petition. 49 C.F.R. § 1152.29(a) (2004). If the railroad agrees to negotiate with the interested party, the STB is authorized to issue a Notice of Interim Trail Use ("NITU"). 16 U.S.C. § 1247(d)(2000); 49 C.F.R. § 1152.29(d). Issuance of a NITU provides for a 180–day period in which the railroad may negotiate an agreement for interim trail use with a qualified trail operator. *Id.* If an agreement is reached within the authorized time period, interim trail use is authorized by the NITU "indefinitely for the duration of recreational trail use." *Caldwell,* 391 F.3d at 1230. This authorization is subject to the trail operator's fulfillment of its agreed-upon obligations and the STB's retention of jurisdiction over the right-of-way for possible future railroad use. *Id.* If no agreement is reached, however, the NITU "automatically converts into an effective ... notice of abandonment." *Preseault,* 494 U.S. at 7 n. 5, 110 S.Ct. 914.

6. The Rails–to–Trails Act provides that interim trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). By treating interim trail use as a discontinuance instead of an abandonment, the Rails–to–Trails–Act prevents property interests in easements from reverting to the abutting landowner. *Preseault,* 494 U.S. at 8, 110

ized the City of Clovis to use the right-of-way as a public trail if SJVR and SPT could reach an agreement with the city within a 180–day period beginning on May 28, 1995—the day the ICC had issued SJVR the abandonment exemption. *Id.* The ICC also authorized SJVR to begin removing track and related materials, but not bridges, culverts, and trestles. *Id.* In 1995, as SJVR, SPT, and the city conducted negotiations, SJVR began removing tracks, ties, and other railroad equipment from the rail line segment at issue. Compl. ¶ 13; *see also Toews*, 376 F.3d at 1374. Most of the equipment had been removed by July 1995. Compl.¶ 13; Pl.'s Opp'n, at 8; *see also Toews*, 376 F.3d at 1374.

The 180–day negotiation period authorized by the NITU was set to expire on November 24, 1995 without an agreement between the parties, but was extended several times and ultimately set for January 31, 1998. Compl. ¶¶ 14–15. SJVR and SPT finally reached an agreement with the city on December 22, 1997 through which the city purchased SJVR's and SPT's interests in the rail line segment. Compl. ¶ 16.

After acquiring the railroads' interests, the City of Clovis constructed a twelve-foot wide paved recreation path for bicycling, jogging, skating, and other lawful public activities along the right-of-way. *Toews*, 376 F.3d at 1374.

## II. Procedural Posture

Plaintiff filed the instant complaint on December 11, 2003 alleging a taking without just compensation in violation of the Fifth Amendment. On February 9, 2004, the parties jointly moved for a stay pending the Federal Circuit's consideration of *Toews*, 376 F.3d 1371, which involved liability issues nearly identical to those in the present case. The Court granted the motion to stay on February 12, 2004. Upon the resolution of *Toews*, the parties filed a Joint Proposed Scheduling Order, which was adopted by the Court on December 15, 2004.

On January 3, 2005, the Government filed a Motion for Judgment on the Pleadings

pursuant to Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC"), arguing that the Federal Circuit's decision in *Caldwell* requires the Court to dismiss Renewal's complaint as time-barred. Plaintiff responded to the Government's motion by filing an Opposition, arguing that the doctrine of collateral estoppel precludes the Government's reliance on *Caldwell*, that this case is distinguishable from *Caldwell*, and that, in any case, *Caldwell* was incorrectly decided. The Government subsequently filed a Reply responding to each of plaintiff's arguments.

## *DISCUSSION*

### I. Standard of Review

As noted above, defendant's motion under RCFC 12(c) is based on the contention that plaintiff's claim is time-barred. The applicable statute of limitations provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501; *see also Frazer v. United States*, 288 F.3d 1347, 1351 (Fed.Cir. 2002). This statute is jurisdictional and is thus strictly construed. *Bowen v. United States*, 292 F.3d 1383, 1385 (Fed.Cir.2002); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir. 1988). In other words, the statute of limitations is an essential element a plaintiff must satisfy to avail himself of the Tucker Act's waiver of sovereign immunity. *See S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 52 Fed.Cl. 444, 452 (2002). Thus, in the Court of Federal Claims compliance with 28 U.S.C. § 2501 is a prerequisite to the court's subject matter jurisdiction.

"[I]f a party raises an issue as to the court's subject matter jurisdiction on a motion for judgment on the pleadings, the ... judge will treat the motion as if it had been brought under Rule 12(b)(1)." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Civil Procedure* § 1367, at 221 (3d ed.2004); *see also Rogers v. Atwork*

S.Ct. 914. The outcome is that "the abandonment of the corridor is blocked 'even though the conditions for abandonment are otherwise met.'"

*Caldwell*, 391 F.3d at 1229 (quoting *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 139 (D.C.Cir.1998)).

*Corp.,* 863 F.Supp. 242, 244 (E.D.Pa.1994) ("When a party raises matters [in a 12(c) motion] that could have been raised in a 12(b) motion, a court may treat the motion as if it were a 12(b) motion.").[7] Accordingly, we shall treat defendant's motion pursuant to RCFC 12(c) as a motion pursuant to RCFC 12(b)(1) to dismiss plaintiff's complaint for lack of subject matter jurisdiction. Where, as here, defendant does not challenge the truth of the jurisdictional facts alleged in the complaint, the court must accept as true the facts alleged. *See Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.1988); *see also Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995) (stating that courts are obligated "to draw all reasonable inferences in plaintiff's favor").

## II. Analysis

### A. *Under Caldwell v. United States, Plaintiff's Claim is Time–Barred*

■ In *Caldwell,* the Federal Circuit considered the accrual date for takings claims based on the Rails–to–Trails Act. The court began with the Federal Circuit's previous rulings in *Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996) (en banc), and *Toews,* 376 F.3d 1371, both of which established that a Fifth Amendment taking occurs under the Rails–to–Trails Act "when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." *Caldwell,* 391 F.3d at 1233; *see also Preseault,* 100 F.3d at 1552; *Toews,* 376 F.3d at 1376. It then defined the issue before the court as a question of when exactly state law reversion interests are forestalled, *Caldwell,* 391 F.3d at 1233, concluding that "the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued." *Id.* at 1235. The Federal Circuit has, therefore, clearly and unambiguously held that the date of NITU issuance is the date of accrual for Rails–to–Trails Act takings claims.

According to Renewal's complaint, the STB issued a NITU for the railroad right-of-way on October 13, 1995. Compl. ¶ 11. Applying the *Caldwell* holding to the facts of this case, the date the NITU was issued, October 13, 1995, was the date of accrual for plaintiff's taking claim. Renewal's complaint was filed more than 8 years after the date of accrual, well past the six-year limit established in 28 U.S.C. § 2501. The Court, therefore, does not possess jurisdiction to hear plaintiff's taking claim.

*Caldwell* constitutes precedent binding upon this Court and must be followed. *See Commonwealth Edison Co. v. United States,* 46 Fed.Cl. 29, 35 n. 5 (2000), *aff'd,* 271 F.3d 1327 (Fed.Cir.2001) ("Under the doctrine of *stare decisis,* questions of law decided by the United States Court of Appeals for the Federal Circuit constitute binding precedent upon this Court."). Plaintiff itself acknowledges that the Court is bound by *Caldwell.* Pl.'s Opp'n, at 10.

### B. *Plaintiff's Reliance on Toews v. United States is Misplaced*

*Toews* involved two consolidated cases that had been filed separately by plaintiffs Menno and Evelyn Toews and Norman Meachum seeking just compensation under the Fifth Amendment for the alleged taking of their respective properties. 376 F.3d at 1375. The material facts and allegations in this case are substantially similar to those in *Toews.* Both cases involve the same railroad line. Decl. of Robert J. Rosati ¶ 6; Joint Mot. to Stay ¶ 4. The right-of-way conveyances are virtually identical. Compl. Ex. A–1; *Toews,* 376 F.3d at 1373. Plaintiff's property is located within two miles of both parcels of property involved in *Toews.* Decl. of Robert J. Rosati ¶ 8. Furthermore, the allegations in plaintiff's complaint are virtually identical to the allegations in the *Toews* complaints. Decl. of Robert J. Rosati ¶ 7; Joint Mot. to Stay ¶ 4. The *Toews* court held

---

7. In this case defendant's motion for judgment on the pleadings is premature because defendant has not filed an answer, and the pleadings are therefore not "closed" within the meaning of RCFC 12(c). *See* Wright & Miller, *supra,* § 1367, at 211–14. Plaintiff has not asked the Court to deny the Government's motion on that basis, and the Court sees no useful purpose in doing so since the Court is treating the motion as a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1). *See also* RCFC 12(h)(3).

that the scope of the easements in that case did not extend to the city's use of the right-of-way as a recreational trail, so a taking had occurred. 376 F.3d at 1376–77.

■ Renewal argues that the Government is collaterally estopped from relying on *Caldwell* based on the Federal Circuit's holding in *Toews*. Pl.'s Opp'n, at 3–6. "Under the doctrine of issue preclusion, also called collateral estoppel, a judgment on the merits in a first suit precludes relitigation in a second suit of issues actually litigated and determined in the first suit." *Innovad, Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir.2001). Issue preclusion operates only if the following factors are met: (1) the issue is identical to the one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. *Id.*

■ Plaintiff claims that the resolution of the "issues of if, when, and how a taking occurred" in *Toews* collaterally estops the Government from arguing that the taking occurred in this action when the NITU was issued. Pl.'s Opp'n, at 2. However, plaintiff itself concedes that "the statute of limitations was not in dispute in *Toews*." *Id.* The complaint in that case was filed August 23, 2000. Complaint, *Toews v. United States*, 53 Fed. Cl. 58 (2002) (No. 00–508L). The *Meachum* complaint was filed February 28, 2001. Complaint, *Meachum v. United States*, 53 Fed.Cl. 58 (2002). The central issue in *Toews* was the scope of the easements originally granted to the railroad, not the accrual date of the plaintiffs' claims. *Toews*, 376 F.3d at 1376. The *Toews* court held that the scope of the original easements did not extend to the city's use of the right-of-way as a recreational trail, so a taking had occurred. *Id.* at 1376–77. At no point did the court in *Toews* state specifically when this taking had occurred. Contrary to plaintiff's argument that the *Toews* court decided "if, how, and when" a taking occurred, the *Toews* court merely determined the range of uses permitted by the railroad's easements. The *Cald-*

*well* opinion supports the conclusion that *Toews* did not address the issue of accrual when it states that "[t]his case requires [the Federal Circuit], *for the first time*, to determine when [a Rails–to–Trails Act] Fifth Amendment takings claim accrues for purposes of the six-year statute of limitations under the Tucker Act." *Caldwell*, 391 F.3d at 1228 (emphasis added). This statement clearly indicates that the *Caldwell* court did not read *Toews* as providing a definitive answer as to when a taking has occurred in a Rails–to–Trails Act case.

The sole issue before the court on the Government's motion is the accrual date of plaintiff's taking claim. This issue is sufficiently different from the issue in *Toews*, which only addressed the scope of the railroad's easements, to prevent the application of collateral estoppel. Therefore, because the issue before the Court was not expressly addressed in *Toews*, the first element of collateral estoppel is not met and the doctrine cannot govern the resolution of this case.

C. *Caldwell v. United States Applies Whether or Not the Easement was Abandoned Prior to the Issuance of the NITU*

Plaintiff attempts to factually distinguish this case from *Caldwell* by arguing that here the state law easement was abandoned in the summer of 1995 before the NITU was issued in October. Pl.'s Opp'n, at 6–7. Renewal claims, therefore, that the state law reversionary interests did in fact take effect, and the alleged taking resulted from the imposition of a new burden on its property. In *Caldwell*, on the other hand, the appellants made no allegation of abandonment prior to the issuance of the NITU; the alleged taking in *Caldwell* resulted from the blocking of state law reversionary property interests that would have taken effect if the Government had not interfered. *Caldwell*, 391 F.3d at 1232. If plaintiff's argument of abandonment is accepted, the alleged taking in this case occurred not from the blocking of state law reversionary interests, but from the imposition of a new burden on plaintiff's property.

The Court need not determine whether the easement was abandoned prior to the issuance of the NITU on October 13, 1995. *Caldwell* applies whether or not the easement was abandoned in the summer of 1995 because in either case the only Government action that could give rise to plaintiff's taking claim was the issuance of the NITU. When the *Caldwell* court held that the issuance of the NITU was the triggering event for a Rails–to–Trails Act taking claim against the Government, it emphasized that this "is the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." *Caldwell*, 391 F.3d at 1233 (emphasis in original). Once the NITU is issued the Government steps out of the picture. As the *Caldwell* court explained, "[t]he task of finalizing the trail use agreement under the Trails Act falls entirely on the railroad and the trail operator. Indeed, the regulations do not even require the railroad and the trail operator to notify the STB that an agreement has been finalized." *Id.* at 1234. The *Caldwell* court then proceeded to look at both the date of issuance of the original NITU as well as the date that the original NITU was expanded in scope to cover a greater portion of the right-of-way. *Id.* at 1235. The court did not consider the Government's grant of the parties' later request for a NITU deadline extension to be a possible date of NITU issuance. As both of the dates the court considered to be "potential dates of NITU issuance" were more than six years before the complaint was filed, the Court held that the appellants' claim was barred under the statute of limitations. *Id.*

The Court is convinced that this reasoning applies here as well because, like *Caldwell*, the only Government action giving rise to plaintiff's taking claim was the NITU issuance on October 13, 1995. After this date, the Government's involvement in the railbanking process was limited to extending the NITU's expiration date several times at the request of the parties.[8] In its complaint, plaintiff specifically states that "[t]he action of the United States, by and through the Interstate Commerce Commission and the Surface Transportation Board, in exercising authority under [the Rails–to–Trails Act], has resulted in the taking and deprivation of Plaintiff's property." Compl. ¶ 18. Focusing on the action of the Government, the Court finds that the only action giving rise to plaintiff's taking claim on the part of the Government could be the issuance of the NITU. This is true whether the alleged taking resulted from the blocking of state law reversionary interests or the imposition of a new burden on plaintiff's property. In either situation, the landowner's claim accrues on the date of NITU issuance. As the *Caldwell* court held, "the appropriate triggering event for *any* takings claim under the Trails Act occurs when the NITU is issued." 391 F.3d at 1235 (emphasis added). Thus, even if the easement is assumed to have been abandoned in the summer of 1995, the *Caldwell* holding is still applicable and Renewal's claim accrued on October 13, 1995, the day the NITU was issued.

### D. *Plaintiff's Use of the Land Subject to the Easement is Irrelevant*

Plaintiff alleges that it used the land subject to the easement at various periods of time between the 1970s and 1998, so its claim did not accrue with the NITU issuance. Pl.'s Opp'n, at 7–9. However, Renewal provides no explanation as to why such use is pertinent to the accrual question, and based on the *Caldwell* holding the Court can see no reason why it might be relevant. *Caldwell* held that the issuance of a NITU triggers a landowner's potential Rails–to–Trails Act taking claim. 391 F.3d at 1235. It did not make the accrual date dependent upon whether or not the landowner had previously made use of the right-of-way.

8. As noted above, the *Caldwell* court did not consider the Government's grant of the parties' request for a NITU deadline extension to be a potential date of NITU issuance. Furthermore, even if such a grant were a potential date of NITU issuance, the STB's last NITU deadline extension grant in this case occurred on November 17, 1997. Compl ¶ 15. As Renewal did not file its complaint until December 11, 2003, its claim would still be barred by the six-year statute of limitations.

### *CONCLUSION*

For the foregoing reasons, defendant's Motion for Judgment on the Pleadings, treated as a motion to dismiss for lack of subject matter jurisdiction, is GRANTED. The Clerk of the Court is directed to enter judgment dismissing plaintiff's complaint for lack of subject matter jurisdiction.

IT IS SO ORDERED.